## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GEOFFREY CALHOUN, et al. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 1:09-CV-03286-TCB |
| v. | ) | |
| | ) | |
| RICHARD PENNINGTON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| FELICIA ANDERSON | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 1:11-CV-3398-SCJ |
| v. | ) | |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CAROLINE CROLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 1:15-CV-03303-RWS |
| CITY OF ATLANTA and STEPHENSON | ) | |
| CAMILLE, | ) | |
| | ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| AUSTIN GATES, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
|     v. | ) | 1:15-CV-03307-LMM |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
|     Defendants. | ) | |

| | | |
|---|---|---|
| JOHN RUCH, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 1:15-CV-03296-MHC |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
|     Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| COREY TOOLE | ) | |
| | ) | |
|     Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:16-CV-02909-CAP |
|     v. | ) | |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
|     Defendants. | ) | |

## **BRIEF IN SUPPORT OF PETITION FOR EMERGENCY RELIEF FROM CHIEF JUDGE OF THE FEDERAL DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA**

Now Comes the City of Atlanta (the "City"), on behalf of itself and the individually named defendants, and files this Brief in Support of its Petition for Emergency Relief ("Petition") from the Chief Judge of the Federal District Court for the Northern District of Georgia. The Petition pertains to the following six interrelated civil actions (collectively, the "Lawsuits"):

1. *Calhoun et al. v. City of Atlanta et al.*, 1:09-CV-03286-TCB ("*Calhoun*")
2. *Anderson v. City of Atlanta et al.*, 1:11-CV-3398-SCJ ("*Anderson*")
3. *Croland v. City of Atlanta et al.*, 1:15-CV-03303-RWS ("*Croland*")
4. *Gates v. City of Atlanta et al.*, 1:15-CV-03307-LMM ("*Gates*")
5. *Ruch v.* City of Atlanta *et al.*, 1:15-CV-03296-MHC ("*Ruch*")
6. *Toole v. City of Atlanta et al.*, 1:16-cv-02909-CAP ("*Toole*")

## I. **Introduction**

This Petition pertains to six Lawsuits against the City of Atlanta brought by Counsel Daniel Grossman and Gerald Weber ("collectively, "Counsel" or "Plaintiffs' Counsel") pursuant to 42 USC §1983 (the "Federal Claims"). The Lawsuits' pleadings and other court filings show that the Federal claims against the City are inextricably interrelated. As explained and documented herein, Counsel's monitoring role in the *Calhoun* and *Anderson* Lawsuits, coupled with the assignment of the six Lawsuits to six different Judges, have resulted in conflicts of interest by Plaintiffs' Counsel. The City brings this Petition to the Chief Judge of the Federal Court's Northern District of Georgia, because six Judges in the Atlanta

3

Division are affected by this matter; the City believes that a comprehensive solution is needed to remedy Counsel's conflicts of interest. The impetus for the timing of this Petition is the appearance of Counsel's conflict of interest in a new context, specifically, discovery in recently-filed Lawsuits.

## II. Overview

This section provides an overview of how the Lawsuits are interconnected and how the conflicts of interest are manifested. The supporting documentation and citations are set forth in Sections III through VI, *infra*.

The Six Lawsuits allege misconduct by the Atlanta Police Department ("APD") related to the Constitution's Fourth Amendment protections regarding arrests, and First Amendment protections regarding expression and filming police activity. Plaintiffs' Counsel[1] brought suit under 42 USC §1983. Each Lawsuit arose from an arrest[2]. Though the circumstances of the arrests vary, the fundamental issue at the core of each Lawsuits' Federal Claims – the existence of a

---

[1] The sole exception is *Toole*, for which Mr. Grossman is not counsel-of-record. The *Toole* counsel-of-record are Gerald Weber, Mawuli Davis, Robert Bozeman and Nora Benavidez. There is a third attorney serving as co-counsel with Mr. Grossman and Mr. Weber in the other Lawsuits, though their role as co-counsel is immaterial to the City's Motion. Mr. Greg Nevins is co-counsel in *Calhoun*; Mr. Albert Wan is co-counsel in *Anderson*; Ms. Hollie Manheimer is co-counsel in *Ruch*; Mr. Brian Spears is co-counsel in *Croland*; and Ms. Cynthia Counts is co-counsel in *Gates*.

[2] The *Calhoun* Lawsuit arose from multiple arrests that occurred at one time.

City custom, policy or practice of misconduct[3] – is interrelated between the Six Lawsuits.

The *Calhoun* and *Anderson* cases arose from arrests that occurred on September 10, 2009 and October 14, 2009 respectively. Both cases were settled, and the settlement terms in each mandate specific APD reforms. The *Calhoun* Settlement Order was entered on December 15, 2011 (the "*Calhoun* 2011 Order")[4]; the *Anderson* Settlement Order was entered on March 22, 2012 (the "*Anderson* 2012 Order")[5]. The *Calhoun* and *Anderson* dockets show that, after the entry of the settlement orders, no case activity occurred until 2015.

The *Croland* Lawsuit aroses from an arrest on June 1, 2014; the *Gates*, *Ruch* and *Toole* Lawsuits arose from arrests on November 25, 2014 during the "Ferguson protests"[6]. (*Croland*, *Gates*, *Ruch* and *Toole*, collectively the "Active Lawsuits"). Plaintiffs' Counsel filed the *Croland*, *Gates* and *Ruch* Lawsuits on September 21, 2015; the *Toole* Lawsuit was filed on August 10, 2016.

After the arrests at issue in the Active Lawsuits, but before the Active Lawsuits were filed with this Court, Plaintiffs' Counsel returned to the *Anderson*

---

[3] *Monell v. Department of Social Services*, 436 U.S. 658, 708 (1978).

[4] *Calhoun*, doc. 280.

[5] *Anderson*, doc. 16.

[6] The Ferguson protests arose from a Ferguson, Missouri grand jury decision not to indict Missouri police officer Darren Wilson in the shooting death of Michael Brown.

and *Calhoun* courts, moving for contempt of the settlement orders. Counsel moved for contempt of the *Anderson* 2012 Order on February 17, 2015, and moved for contempt of the *Calhoun* 2011 Order on March 17, 2015. Documents described herein below show that Counsel filed the Contempt Motions in anticipation of filing the Active Lawsuits.

The contempt motions attached copies of APD trainings between 2012-2014 with curricula on the First and Fourth Amendment protections and policing protocol at issue in *Anderson* and *Calhoun*. As noted in the contempt motions, however, the trainings did not meet the specific mandates of the *Calhoun* 2011 Order and *Anderson* 2012 Order.[7] Though APD had performed the constitutional training mandated by the Orders, and had performed all training required by the State of Georgia[8], the City conceded to the *Calhoun* and *Anderson* courts that it had not met all of the *technical* requirements of the 2011 and 2012 Orders.

A contempt order was granted in *Anderson* (the "*Anderson* Contempt Order") and in *Calhoun* (the "*Calhoun* Contempt Order") in May 2015. Pursuant to the Orders, the City paid attorneys' fees totaling $26,000 in *Anderson* and

---

[7] For example, the training did not include details about the APD operation which gave rise to the *Calhoun* lawsuit and the discipline received by APD officers involved, as required by the *Calhoun* 2011 Order.

[8] OCGA § 35-8-21, entitled "Annual Training Requirements", requires annual training for officers to maintain their Georgia Peace Officer Standards and Training (P.O.S.T.) certification.

$48,420 in *Calhoun*.  As part of the *Calhoun* Contempt Order, the court granted Counsel's request to be paid monitors of the City's compliance with the *Calhoun* 2011 Order and *Calhoun* Contempt Order (collectively, the "*Calhoun* Orders"). The Court approved Counsel's plea to collect a $520 per hour monitoring fee. Counsel received wide latitude to request documents "solely for the purpose of monitoring" the City's compliance.[9]  Between May 2015 to the time of filing this Petition, the City has paid $205,000 to Plaintiffs' Counsel in monitoring fees.

Four months after the *Calhoun* and *Anderson* Courts granted the Contempt Orders, and despite serving as *Calhoun* paid monitors, Counsel filed the Active Lawsuits[10].  The sole basis for the Federal Claims in the Active Lawsuits was the *Calhoun* Contempt Order and *Anderson* Contempt Order, and the complaint in each Active Lawsuit includes over five full pages regarding the Contempt Orders. Though contempt orders, by design, pertain solely to a party's compliance with the specific mandates of a particular court order, the Active Lawsuits' portray the Contempt Orders as evidence of an alleged pervasive failure to train, which make the City's "deliberate indifference to the need for policies and training . . . patently

---

[9]  *Calhoun*, doc. 289, §11.

[10]  The only Active Lawsuit not filed in September 2015 was *Toole*, filed in August 2016.

7

clear".[11]   The remedies sought by the Active Lawsuits include attorneys' fees, and Counsel has urged the City to settle: "We remain of the view that settlement is both beneficial to our client and very much in the interest of Atlanta taxpayers, as [Attorneys'] fees will vastly exceed [Plaintiff's] modest damages in this case".[12]

In the Active Lawsuits, which arose from arrests during 2014, Counsel is admittedly using the discovery process to obtain documentation of non-compliance with the *Calhoun* 2011 Order and *Anderson* 2012 Order, requesting a temporal scope for production beginning on December 8, 2010, when the *Calhoun* settlement agreement was reached.   Similarly, as monitors of *Calhoun* compliance, Counsel readily admits that it represents both the Court and the *Calhoun* plaintiffs. Counsel has expressed the desire to ensure that the *Calhoun* plaintiffs receive the "benefit of their [settlement] bargain".[13]   Additionally, Counsel has billed the City for monitoring activity which yields them information about specific employees who are non-compliant with the Calhoun Orders.   Despite repeated requests,

---

[11] *Ruch* Amended Complaint, ¶¶ 70, 77; *Croland* Amended Complaint; ¶¶ 51-52; *Gates* Amended Complaint, ¶ 74; *Toole*, doc. 1, ¶¶ 58, 67.
[12] Email from Gerald Weber dated January 9, 2017, attached hereto as <u>Exhibit A</u>.
[13] Transcript of 4-25-16 Meeting ("Transcript", attached hereto as <u>Exhibit B</u>) @ 125: 20-25.

Counsel refuses to provide the gathered information to the City, explaining that it will use the information to obtain a "global settlement"[14].

The following timeline shows the events discussed in this Section II:

| | |
|---|---|
| **December 8, 2010**: | *Calhoun* settlement accepted by Court |
| **December 15, 2011**: | Calhoun 2011 Order entered, requiring specific APD reforms as set forth in settlement agreement |
| **March 22, 2012**: | *Anderson* 2012 Order entered, requiring specific APD reforms as set forth in settlement agreement |
| **2012-2014**: | APD trains on First and Fourth Amendment protections and policing protocol at issue in *Anderson* and *Calhoun*, but fails to complete the *technical* requirements of the "*Calhoun* Training" and "*Anderson* Training" |
| **April 2012 through February 2015**: | No activity on *Calhoun* and *Anderson* dockets |
| **June 1, 2014**: | Croland arrest occurs |
| **November 25, 2014**: | Gates, Ruch and Toole arrests occur (during Ferguson protests) |
| **February 17, 2015**: | Counsel file *Anderson* Contempt Motion Include extensive info re: Ruch and Croland arrests |
| **March 17, 2015**: | Counsel file *Calhoun* Contempt Motion |
| **May 13, 2015**: | *Anderson* Contempt Order issued Attorneys' fees awarded: $26,000 |

---

[14] Email from Daniel Grossman dated April 18, 2016, attached hereto as <u>Exhibit C</u>.

| | |
|---|---|
| **May 19, 2015**: | *Calhoun* Contempt Order issued<br>Attorneys' fees awarded: $48,420 |
| **May 19, 2015**: | Counsel become *Calhoun* paid compliance monitors, $520/hr<br>Fees paid to date: $205,000 |
| **September 21, 2015**: | Counsel file *Croland*, *Gates* and *Ruch* lawsuits<br>Sole basis of Federal Claims =<br>*Calhoun* and *Anderson* Contempt Orders |
| **April 25, 2015**: | In Calhoun compliance meeting, with court reporter present, Counsel admit serving as compliance monitors for the *Calhoun* court and counsel for *Calhoun* plaintiffs to ensure plaintiffs receive the benefit of their [settlement] bargain |
| **June 22, 2016**: | The Honorable Judge Timothy Batten, Sr. appoints Joe D. Whitley as *Calhoun* Special Master to serve as compliance monitor, at joint request of parties; Counsel continues to serve as additional paid compliance monitors |
| **August 10, 2016**: | *Toole* Lawsuit filed by Mr. Weber |
| **September 29, 2016 &<br>December 30, 2016** | *Calhoun* Special Master files first and second Quarterly Reports with preliminary finding that City has complied or attempted in good faith to comply with requirements of the Calhoun Orders that are ripe for consideration |

### III. <u>Summary of Six Lawsuits</u>

The APD arrests at issue in the Lawsuits occurred during two different time periods, 2009 and 2014. *Calhoun* and *Anderson* arose from incidents which

occurred in 2009; *Ruch*, *Toole* and *Gates* arose from the arrest of three participants in the November 2014 "Ferguson" protests in downtown Atlanta; and *Croland* arose from the arrest of a participant in a food distribution event for homeless individuals that occurred in May 2014.

## A.  *Calhoun*

The *Calhoun* Lawsuit arose out of the September 10, 2009 APD operation at the Eagle nightclub and adjoining premises (collectively, the "Eagle"), during which officers stormed the Eagle and searched, detained, and/or arrested individuals who were not personally suspected of criminal activity. The Lawsuit was filed on November 24, 2009 and was assigned to Judge Batten. Approximately one year later, Judge Batten referred the case to Magistrate Judge Baverman to conduct settlement negotiations.[15] At the conclusion of the successful negotiations, Judge Baverman and the parties drafted a proposed settlement, which included a set of specific APD reforms as an attachment thereto[16] ("the Exhibit A Reforms").  Judge Batten approved the settlement terms on December 8, 2010[17]. The Exhibit A Reforms were aimed at preventing the types of constitutional violations which occurred at the Eagle, and included a bi-annual training that

---

[15] *Calhoun*, doc. 258.
[16] Exhibit A: Reforms of the Atlanta Police Department, *Calhoun*, doc. 280.
[17] *Calhoun*, doc. 265-1.

specifically addressed the Eagle events ("*Calhoun* Training"). Judge Batten incorporated the Exhibit A Reforms into a Court Order on December 15, 2011.[18]

The City's remorse regarding APD's Eagle operation was reflected by the unprecedented nature of Mayor Reed's[19] press conference regarding the Eagle settlement, conducted on behalf of himself, the Atlanta City Council and the Atlanta Police Department. During the press event, Mayor Reed expressed his personal views about the Eagle operation:

> I believe that what occurred that evening should not have happened and should not happen again. As mayor of the city of Atlanta, I feel pain for anyone mistreated in our city and apologize to each plaintiff in the *Calhoun* case.[20]

Many trainings and other reforms have been, and continue to be implemented to prevent repetition of the 2009 operation. In filing this Petition, the City is not attempting to minimize the seriousness of the City's misconduct that resulted in the litigation and settlement of *Calhoun*.

## B.    *Anderson*

The *Anderson* Lawsuit arises from APD's October 14, 2009 arrest of Ms. Felicia Anderson, who was taking pictures from her front porch of APD's arrest of

---

[18] *Calhoun*, doc. 280 (the "*Calhoun* 2011 Order").

[19] The APD actions giving rise to the *Calhoun* litigation occurred during the tenure of Mayor Shirley Franklin; the case was settled ten months after Mayor Reed took office.

[20] City of Atlanta Archives.

her neighbor.    The parties reached a settlement, and a Consent Order was entered on March 22, 2012.[21] The *Anderson* 2012 Order required revision of Standard Operating Procedures and additional training ("*Anderson* Training") aimed at protecting the right of citizens to document police activity, free from police interference.

### C.    *Croland*[22]

Caroline Croland was arrested by APD on June 1, 2014 in Woodruff Park while at a Food Not Bombs event. Plaintiff's arrest occurred after a verbal confrontation with the arresting officer, which is captured on videotape; she was charged with disorderly conduct for "causing, provoking or engaging in a fight or riot".    Plaintiff alleged that the true reason for her arrest was retaliation for her filming of police officers in Woodruff Park the week prior as part of a "Cop Watch" volunteer effort.    She asserted that her arrest violated her constitutional First and Fourth Amendment rights, and brought suit against the City pursuant to 42 U.S.C. §1983.    She also brought suit against APD officers, in their individual capacities, under Federal and State law.

---

[21] Anderson, doc. 16 (the "*Anderson* 2012 Order").
[22] Defendants' Motion to Dismiss is pending.

### D.    *Gates*[23]

Austin Gates was a demonstrator in the November 25, 2014 Ferguson protest in Atlanta. Violence erupted during the protest.  In an effort to restore order, APD officers instructed everyone wearing a mask to remove it. Mr. Gates did not remove his mask, and APD arrested him for violation of the State Anti-Mask Statute.  (O.C.G.A. §16-11-38).  The Supreme Court of Georgia has twice upheld the Anti-Mask Statute as constitutional.  *Daniels v. State*, 264 Ga. 460 (1994); *State v. Miller*, 260 Ga. 696 (1990).  Mr. Gates claimed that his arrest violated his constitutional First and Fourth Amendment rights, and brought suit against the City pursuant to 42 U.S.C. §1983.  He also brought suit against APD officers, in their individual capacities, under Federal and State law.

### E.    *Ruch*[24]

The *Ruch* case arose from the arrest of John Ruch, a Creative Loafing journalist who was taking photographs with his cell phone at the November 25, 2014 Ferguson protest in Atlanta. Violence erupted during the protest, at which time APD officers instructed everyone to clear the immediate area.  Mr. Ruch did

---

[23] The City's Motion to Dismiss was denied by the *Gates* Court.  The issues of qualified and official immunity are on appeal to the Eleventh Circuit Court of Appeals, case number 1:15-cv-03307-LMM.  The remainder of the Lawsuit remains with the District Court and is stayed.

[24] *Ruch* is in the discovery phase.

14

not have media credentials with him and failed to leave. APD charged Mr. Ruch with "disorderly conduct - obstruction". The circumstances at the time and location of Mr. Ruch's arrest were captured on videotape. Mr. Ruch claimed that his arrest violated his constitutional First and Fourth Amendment rights, and brought suit against the City pursuant to 42 U.S.C. §1983. He also brought suit against APD officers, in their individual capacities, under Federal and State law.

**F.    _Toole_[25]**

The _Toole_ case arose from the arrest of Corey Toole, a participant in the November 25, 2014 Ferguson protest in Atlanta. Violence erupted during the protest, at which time APD officers instructed everyone to clear the immediate area. Mr. Toole continued to use his iPhone camera to videotape the surrounding crowd; he was arrested and charged with disorderly conduct. Mr. Toole claimed that his arrest violated his constitutional First and Fourth Amendment rights, and brought suit against the City pursuant to 42 U.S.C. §1983. He also brought suit against APD officers, in their individual capacities, under Federal and State law.

---

[25] A partial Motion to Dismiss is pending in _Toole_.

## IV. <u>Counsel Obtained Contempt Orders to Benefit New Clients</u>

There is substantial evidence that Counsel moved for contempt in *Anderson* and *Calhoun* with the intent of using the Contempt Orders to benefit the Active Lawsuits.

The arrests at issue in the Active Lawsuits occurred in 2014, more than two years after entry of the *Calhoun* 2011 Order and *Anderson* 2012 Order.   Between entry of the two orders and February 2015, the *Calhoun* and *Anderson* dockets were dormant.   During that time, the City performed annual department-wide trainings with instruction on the First and Fourth Amendment constitutional issues implicated by *Calhoun* and *Anderson* ("Department-wide Trainings").[26] Documents filed by Counsel in support of their *Anderson* and *Calhoun* Contempt Motions show that APD mistakenly believed that the 2013 Department-wide Training qualified as the biannual "Calhoun Training" required by the *Calhoun* 2011 Order.[27]  The City does not dispute that the 2013 Department-wide Training

---

[26] Lesson plans for the APD trainings were attached to the Motions for Contempt, and show that the curricula included "refresher" training regarding search and seizure; First Amendment training using APD's handling of the Occupy Atlanta protests as a model for managing future mass protests; and the right of the public to film APD, using "Cop Watch" activities as an example of protected conduct. *Calhoun*, doc. 281-12, 281-13; *Anderson*, doc. 17-3.

[27] *Calhoun*, doc. 281-4; *Anderson*, doc. 17-3 (email from Deputy City Attorney Karen Thomas to Daniel Grossman, attaching "[d]ocumentation related to the Eagle/Calhoun Training").

failed to include all of the elements necessary to constitute a "*Calhoun* Training"[28]; nonetheless, it is noteworthy that Counsel did not raise the issue of non-compliance prior to its correspondence with the City on December 5, 2014.[29]

The Ferguson protests, at which plaintiffs Gates, Ruch and Toole were arrested, occurred on November 25, 2014. Upon obtaining them as clients, Counsel did not simply initiate a Lawsuit on each one's behalf. Instead, Counsel added the interim step of returning to the *Calhoun* and *Anderson* courts to obtain Contempt Orders, which Counsel would then use as the basis for the Federal Claims in the Active Lawsuits. Attachments to the *Anderson* Contempt Motion show that Counsel began to email the City for document production regarding *Calhoun* and *Anderson* compliance ten days after the arrests of Gates, Ruch and Toole.[30]

Counsel filed the *Anderson* motion for contempt in February 2015 and the *Calhoun* motion for contempt in March 2015.[31] Extensive information about the Ruch and Croland arrests were included in the *Anderson* contempt motion as evidence of alleged harm arising from the City's noncompliance. Attachments to the contempt motion included a declaration by Ruch and a declaration by Croland

---

[28] The 2013 Department-wide Training did not include discussion of the specific changes contained in the *Calhoun* 2011 Order, as required by the Exhibit A Reforms contained therein. *Calhoun*, doc. 280, p. 9.

[29] *Anderson*, doc. 17-7.

[30] *Id.*

[31] *Anderson*, doc. 17; *Calhoun*, doc. 281.

in support of the Motion for Civil Contempt in *Anderson*.[32]    The fee request accompanying the contempt motion included $17,000 of billing pertaining to Ruch and Croland.[33]

In the recently-filed *Ruch* Joint Preliminary Report and Discovery Plan,[34] Counsel confirmed their intended use of the Contempt Orders for the Active Lawsuits.    In discussion of the City's document preservation obligations, Plaintiffs' Counsel advised the *Ruch* Court that the City should have anticipated the *Ruch* litigation as of February 17, 2015, when Counsel filed their Motion for Contempt in *Anderson*.[35]

The *Anderson* and *Calhoun* Contempt Orders were issued in May 2015.[36]   In its order granting the contempt motion, the *Anderson* court noted that the motion served no substantial purpose.

> Defendant began attempting to comply with the [2012] Order shortly after Plaintiff's Counsel notified Defendant of its violations.   <u>Plaintiff's primary achievement in the contempt proceedings</u>, then, <u>was to secure an **additional** Order</u> <u>that</u>

---

[32] *Ruch* Doc. 59 at 9.

[33] *Anderson* 25-7; The *Anderson* Court denied that portion of the fee request. *Anderson*, doc. 31, p. 13.

[34] *Ruch,* doc 59, Second Supplemental and Amended Joint Preliminary Report and Discovery Plan.

[35] *Id.* at 9.

[36] *Anderson*, doc. 31; *Calhoun*, doc. 289.

> mandates compliance with the 2012 Order and ensures
> compliance, now and in the future . . . .[37]

Based on this finding, the Court reduced the attorneys' fees requested by Counsel, approving only 43% of the fee request.[38]    The City paid $25,863 in attorneys' fees and costs, of which Mr. Grossman received $10,400 and Mr. Weber received $10,400.[39]

Though the import of the "additional order" was not apparent at the time of the *Anderson* court's ruling, the importance of the order was illuminated by Counsel's filing of the Active Lawsuits.    The Active Lawsuits rely on the *Anderson* and *Calhoun* Contempt Orders as the sole basis for the Federal Claims, and attach a copy of the Contempt Orders to the four complaints.[40]    While aware that the requirements of the *Anderson* Training and *Calhoun* Training are very specific, and despite receiving documentation of APD's annual First and Fourth Amendment trainings between 2012-2014, Counsel mischaracterize the Contempt

---

[37] *Anderson* doc. 31, p.12 (emphasis supplied).
[38] Counsel requested "a total of $61,130.50 for 124.78 hours, including some expenses". *Anderson* doc. 31, p.11.
[39] *Id*. at p. 13.
[40] *Croland*, doc. 22; *Gates*, doc. 18; Ruch, doc. 32; *Toole*, doc. 1.

Orders to assert a pervasive failure to train.[41]  The following provisions appear in each of the four complaints:

> The City of Atlanta was held in contempt of court for its repeated failure to adopt policies and trainings required by existing [*Anderson* and *Calhoun*] Court orders. . . ."[42]  "The City of Atlanta's deliberate indifference to the need for policies and training, made patently clear by the consent orders it entered into and then violated for years, was a moving force for the constitutional violations suffered by [the plaintiff].[43]

Counsel's use of the *Calhoun* Contempt Order in the Active Lawsuits is particularly troubling given Counsel's role as paid monitor of *Calhoun* compliance at the time of filing.

---

[41] Ironically, the *Ruch*, *Gates* and *Toole* cases arise from the Ferguson protests, which were photographed, recorded and even streamed live by citizens utilizing their phones to capture the demonstrations.  The extensive media coverage of these nationwide protests allowed Atlanta's citizens to observe law enforcement agencies across the country manage these events.  Atlanta had repeated nights of large, peaceful marches throughout downtown, and violent eruptions were quelled in a manner that de-escalated tension and maintained an environment where people felt safe to participate.  Without addressing the validity of the individual arrests in the Active Lawsuits, one need look no further than the Ferguson protests themselves to understand the extensive training provided to APD officers regarding the First and Fourth Amendment rights of Atlanta's citizens.

[42] *Ruch,* doc. 32, ¶¶ 69, 76; *Croland*, doc. 22, ¶ 50; *Gates*, doc. 18, ¶¶ 65, 73; Toole, doc. 1, ¶¶ 57, 64.

[43] *Ruch* Amended Complaint, ¶¶ 70, 77; *Croland* Amended Complaint, ¶¶ 51-52; *Gates* Amended Complaint, ¶ 74; Toole, doc. 1, ¶¶ 58, 67.

## V. *Calhoun*: Identification and Effective Resolution of Counsel's Conflict of Interest

### A.    Identification of Conflict of Interest

In April 2016, attorneys for the City (the "City's Attorneys") recognized that Plaintiffs' Counsel were simultaneously operating as compliance monitors, and as counsel for the *Calhoun* plaintiffs and/or potential new plaintiffs in future litigation.  Upon recognizing Counsel's conflict of interest, the City's Attorneys arranged a meeting with Plaintiffs' Counsel to attempt amicable resolution of ongoing monitoring disputes, to address Counsel's conflict, and to discuss appointment of a special master as a neutral compliance monitor.  The meeting occurred on April 25, 2016, and with prior agreement of all participants[44], a court reporter and videographer were present.

During the meeting, Counsel confirmed their simultaneous representation of the Court and the Plaintiffs.  When asked about their role as compliance monitor, Mr. Grossman responded that, pursuant to the May 19th [2015] Contempt Order, "that's our court ordered obligation, and we've been doing it".[45]  Regarding their role as counsel for the *Calhoun* Plaintiffs, Mr. Grossman stated that Mr. Weber and

---

[44] The meeting was attended by Plaintiffs' Counsel Dan Grossman and Gerald Weber, their paralegal Maya Chaudhuri, Atlanta Compliance Officer Jeffrey Norman, and City's Attorneys Robin Joy Shahar, Maiysha Rashad and Alisha Wyatt-Bullman.  Transcript, @ 2-4.

[45] Transcript @ 30:21- 31:8.

he are "absolutely" still representing the Plaintiffs and are in contact with many of them.[46] He further stated that Plaintiffs are "following this case"[47], and that "what we are simply trying to do is get them the benefit of their bargain"[48].

## B.    Agreement to Special Master Request

At the conclusion of the April 25, 2016 meeting, the City's Attorneys raised the issue of Plaintiffs' Counsel's conflict of interest and provided copies of the Supreme Court case *Young vs. Vuitton*[49].[50] The City's Attorneys informed Counsel that the City would file a motion for a neutral monitor, and hoped that the filing would be a joint motion.[51]

On June 20, 2016, Plaintiffs' Counsel and the City's Attorneys crafted and submitted a joint motion to the Court for appointment of Mr. Joseph Whitley as a special master to the case who would operate as a neutral compliance monitor.[52] As a condition of their consent, Plaintiffs' Counsel required that they retain their role and rights as compliance monitors.[53] Though the City would pay Mr. Whitley's compliance fees, Plaintiffs' consent was predicated on their continuing to be paid

---

[46] Transcript @ 74:14-17.
[47] Transcript @ 74:12-13.
[48] Transcript @ 125:20- 126:14.
[49] *Young vs. US ex rel. Vuitton*, 481 US 787 (1987).
[50] Transcript @ 110:10- 112:18.
[51] Transcript @ 110:16-24; 114:19-22.
[52] *Calhoun*, doc. 308.
[53] *See id.*

compliance fees as well. "[W]e can talk through the independent monitor issue. But, you know, . . . then you would have both the lawyers monitoring and the separate monitors, so you'd have essentially two. I mean, it's going to be expensive for the City, but that's not our concern."[54]

The City agreed to this arrangement, despite its cost, to have APD's compliance efforts evaluated by a neutral third party.[55]

## C.    **Findings of Special Master in Quarterly Reports**

To date, the Special Master submitted two quarterly reports to the Honorable Judge Timothy Batten, Sr., on September 29, 2016 and December 30, 2016.[56] The summary conclusion in both stated that, "[g]enerally, except as set forth otherwise above[57], the Special Master preliminarily finds that the City has complied or attempted in good faith to comply with the requirements of the Court Orders after entry of the 2015 Order, provided the Special Master will re-visit all of the preliminary findings herein in conjunction with future quarterly reports as additional facts are discovered and evaluated."[58] In addition, in his quarterly report of December 30, the Special Master reported:

---

[54] Transcript @ 128:16-26.
[55] *See* Section V(D), *infra.*
[56] *Calhoun*, docs. 324, 325.
[57] The reports found no instances of non-compliance.
[58] *Calhoun*, doc. 324, p. 23; doc. 325 pp. 22-23.

Notably, moving forward under the Procedures Order[59] has not been an insignificant task. The Procedures Order imposed and continues to impose a myriad of additional obligations on the parties and contemplates timelines well beyond the 3 month period that has elapsed since the 9/29 Compliance Report was submitted. . . . Wherever applicable, the City's commitment to compliance with the Procedures Order demonstrates a continuing, good faith commitment to achieving a complete consensus of compliance with the Court Orders, and is given substantial weight for purposes of this report.[60]

## D.     **Impact of Counsel's Conflict of Interest**

The juxtaposition of the Special Master's findings, versus the statements of Plaintiffs' Counsel at the April 25, 2016 meeting, highlights Counsel's lack of impartiality in evaluating the City's compliance.    Throughout the two-hour meeting, Counsel's position was that "[t]he City just doesn't take compliance seriously".[61]

The more troubling issue for the City's Attorneys was Counsel's unwillingness to provide the *specific* information requested by the City to ensure that the alleged compliance deficits identified by Counsel were being addressed. Prior to the April meeting, at Plaintiffs' Counsel's request, the City prepared and distributed a seven-page chart listing each compliance item, providing the language

---

[59] In the September 22, 2016 "Procedures Order", the *Calhoun* Court establishes the "Monitoring, Discovery and Dispute Resolution Procedures" of the Special Master. *Calhoun*, doc. 321-1.

[60] *Calhoun*, doc. 325, p. 3.

[61] Transcript @ 11:9-12.

24

of the court order that describes the necessary compliance actions, and giving the status of APD compliance.[62]

At the start of the April meeting, the City requested Counsel's feedback regarding the chart to be certain that the City understood the specific expectations of Counsel, to identify unresolved compliance issues, and to seek resolution of any disagreements regarding compliance requirements. The following exchange occurred:[63]

> Mr. Norman: The city prepared a chart that went through a lot of the compliance issues. We thought it would be good to get your guys' reaction [now that] you've had an opportunity to review that document.
>
> Mr. Grossman: At a general level, there are some really significant problems with this document. The city simply is not taking accountability for areas of violations and non-compliance, and there are some things in here that still aren't accurate. Now, I don't think it's productive to go off on a metaphysical discussion of whether it's dishonest or simply mistaken . . . . So, I don't think it makes sense to use this as a basis for drilling down and getting into the weeds. It's not going to be productive at all for us at this point, where we are now, to try to get into the weeds of the miniscule noncompliance.

---

[62] Compliance Chart, attached hereto as <u>Exhibit D</u>.
[63] Transcript @ 10:2- 11:22.

The City responded that it was willing to have the discussion "start broadly", but wanted to "go back to the chart specifically" because the City's perception of its compliance efforts are vastly different from Counsel's.[64]

> Ms. Shahar:  I get [your] letters saying that we are not compliant, when I feel that we are proactively compliant.  . . .  I'm a fact person.  So, if you take away the judgment and the conclusion, and we look at the facts, then that's going to help us.  Because then I can get a better sense of what it is specifically that we're not doing so that we can address it specifically.[65]
>
> Mr. Grossman:  We're happy to talk about some specifics, but it's within the framework of simply an illustrative example.  It's really counterproductive at this point because we've done it, and it doesn't work to talk about individual trees or the individual leaves on trees.  <u>If this is going to work, we do need the city to acknowledge its pattern of non-compliance- not only technical noncompliance but an attitude of noncompliance.</u>[66]

This passage is one of many occasions on which Counsel attempted to have the City's Attorneys admit blanket noncompliance with the Court's Order.[67]  In this particular passage, Counsel's conflict of interest is particularly glaring.  Mr. Grossman refused to give the City the information needed to facilitate compliance, unless the City admitted to a "pattern of non-compliance".  By requesting this

---

[64] Transcript @ 13:17-23.
[65] Transcript @ 13:23-14:8.
[66] Transcript @ 15:5-16 (emphasis supplied).
[67] *See e.g.* Transcript @ 76:20-23 (by Mr. Grossman: "How can we have a meeting about compliance without acknowledging the reality of noncompliance?  That's not attaching a label; that's simply being honest.").

admission, during a videotaped meeting, while simultaneously representing Ruch, Croland, Gates and Toole in Lawsuits with 42 USC §1983 causes of action,[68] Counsel blatantly utilized their monitoring role to enhance the strength of their Active Lawsuits and their economic interests.

Under these circumstances, the City determined that the need for a neutral monitor was imperative. The Special Master's findings to-date support the City's determination.[69]

## E. Counsels' Use of Paid Monitoring Authority to Achieve a "Global Settlement"

In their role as *Calhoun* compliance monitors, Plaintiffs' Counsel are required to utilize their position to ensure compliance, and ultimately benefit APD and the citizens it serves. Conversely, Plaintiffs' Counsel are using their role for their own personal gain and economic benefit.

The City's position is that ongoing monitoring in *Calhoun* should be designed to periodically test and evaluate the effectiveness of the systems, policies and procedures implemented by the *Calhoun* Orders. The City values the importance of ongoing monitoring to determine the knowledge of the procedural

---

[68] *See Monell*, 436 U.S. at 708 (precluding municipal liability for a constitutional violation absent an official custom or policy).

[69] *Calhoun*, doc. 324, p. 23; doc. 325 pp. 22-23.

and training reforms amongst officers, as well as actual performance in the field.[70] Monitoring designed in this fashion allows for early identification and correction of any operational problems prior to these problems festering and culminating in non-compliance.

Instead of approaching their monitoring duties as a partnership with the City to facilitate and ensure compliance, Plaintiffs' Counsel have utilized the monitoring process to conduct a fishing expedition for potential claims of additional non-compliance and/or new litigation. For example, on April 8, 2016 the City's Attorneys met with Plaintiffs' Counsel Dan Grossman in an effort to discuss and attempt to resolve any compliance issues related to the *Calhoun* Orders. In that meeting, Mr. Grossman stated that he had photographs and videos of individuals employed by APD who were not wearing nametags while on duty, in violation of the standard operating procedure ("SOP") that was amended as part of the *Calhoun* Orders. On April 14, 2016, the City sent a letter to Counsel requesting that they produce such photos and any other evidence of nonconformity with the SOP's associated with the *Calhoun* Order.[71]

The City's letter explained that this type of information would be "invaluable to the City in our effort to monitor and address adherence to the

---

[70] *See e.g.*, Transcript @ 30:6-15.
[71] Letter from Robin Shahar, dated April 14, 2016, Exhibit C hereto.

requirements of the amended SOP's".[72] In response, Plaintiffs' Counsel sent an email on April 18, 2016, refusing to produce any evidence and instead suggested that such evidence or information should be a part of a "global settlement regarding compliance issues".[73] Withholding information in order to secure a "global settlement" is in direct conflict with Plaintiffs' Counsels court-appointed duties to ensure and monitor compliance of the *Calhoun* Orders.

Counsels' billing practices are another example of the inherent conflict created by their failure to separate their litigation role from their role as court-appointed monitors. The *Calhoun* Contempt Order directs the City to "reimburse Plaintiffs' Counsel for any reasonable fees and costs they expend in ensuring compliance with the Orders of this Court".[74] Pursuant to this provision, Plaintiffs' Counsel are entitled to submit bills to the City for tasks completed in their roles as court-appointed monitors.

Plaintiffs' Counsel have repeatedly submitted bills to the City which list interviews conducted with witnesses whose names and interviewing subject are redacted from the bills. They have submitted bills which list "strategy" as the task

---

[72] *Id.*
[73] Email from Dan Grossman, dated April 18, 2016, Exhibit C hereto.
[74] *Calhoun*, doc. 289, par. 12.

and the subject matter has been redacted.[75] They have also submitted bills for review of the documents or evidence of non-compliance that they have refused to provide to the City, and further these bills do not identify the type of evidence and the type of non-compliance at issue.[76]

Counsels' monitoring approach of withholding alleged evidence of non-compliance in order to secure some kind of "global settlement" and unethical billing practices, are evidence of their conflicting practice of alternating between court-appointed monitors, attorneys for the *Calhoun* Plaintiffs and counsel-of-record on the Active Lawsuits. In fact, in the April 25, 2016 Meeting, regarding compliance with the *Calhoun* Orders, Plaintiffs should have appeared in their role of court-appointed monitor; instead Counsel confirmed that they were acting in a litigation capacity.[77] This monitoring approach is inapposite to the Court-ordered monitor role and the corresponding independence required of that position. Plaintiffs Counsels' practices make it apparent that they are not utilizing their role as court-appointed monitor to facilitate and ensure compliance with the *Calhoun* Orders, as required by the Court.

---

[75] *See, e.g.*, Invoices for Attorney Fees and Expenses, dated October 12, 2016, attached hereto as Exhibit E.

[76] *See* Invoices for Attorney Fees and Expenses, dated September 2016 (entries dated: 9/6/16, 9/13/16), Exhibit E hereto.

[77] Transcript @ 73:14-25- 75:5.

**F.**    <u>**Counsel's Use of Active Lawsuits to Generate New Contempt Claims**</u>

Counsel's intentional misuse of its competing roles now arises in the Active Lawsuits' discovery process.    As a primary example, the temporal scope of Counsel's training-related discovery requests in *Ruch*[78] extend to the entry of the 2010 *Calhoun* settlement to determine APD compliance therewith.    These early documents are immaterial to the Federal Claims pertaining to the 2014 arrests at issue in the Active Lawsuits. [79]    Counsel admit and rely on this immateriality to oppose consolidation of the Active Lawsuits with *Anderson*.    Referring to the Lawsuits at issue in the instant Petition, Counsel provides:

> The Defendants believe that the following cases are related to the present action and anticipate filing a Motion to Consolidate these six cases by January 15. . . . Plaintiff intends to object to consolidation. . . . First, Defendants have indicated a desire to consolidate with the *Anderson* case, but that case was resolved by consent order years before this arrest and the other arrests in the cases identified by Defendants.[80]

Despite their position regarding consolidation, Counsel defend their need for an expanded temporal scope of discovery, explaining that:

> [o]ne of Plaintiff's theories of municipal liability is tied to failure to conduct court ordered trainings and institute court ordered polices that were required by another federal court. . . . Plaintiff should be entitled

---

[78] *Ruch* is the only Active Lawsuit that has reached the discovery phase.

[79] The City does not object to training-related discovery if the training date falls within a timeframe that is material to Ruch's November 2014 arrest.

[80] *Ruch*, doc. 59 at 1-2.

31

to explore in discovery the actions and inactions with regard to municipal liability from the date of the December 8, 2010 order.[81]

Counsel have already received a vast wealth of the *Calhoun* compliance documents in their capacity of *Calhoun* compliance monitors, including files from APD's Office of Professional Standards, training records and incident reports. Counsel now request much of the same information in the Active Lawsuits, and request metadata for all of the electronic items to ensure their authenticity.[82]

The *Calhoun* Procedures Order[83] requires that, prior to submitting a document request to the City, Counsel must submit the request to the Special Master and articulate the compliance-related need for the requested items. Utilizing discovery in the Active Lawsuits to obtain *Calhoun* compliance documents that are immaterial to the 2014 arrests, circumvents the Procedures Order of the *Calhoun* Special Master.[84]

## VI. Counsel's Misuse of the Contempt Orders and Their Conflict of Interest Harm the City and the Judiciary

By filing for *Calhoun* and *Anderson* contempt to benefit new clients, and by serving as compliance monitors for the *Calhoun* Court while simultaneously representing the Plaintiffs in *Calhoun* and the Active Lawsuits, Counsel harms

---

[81] *Ruch*, doc. 62 at 2.
[82] *Ruch*, doc 59 at 6-8; doc. 62 at 3.
[83] *See* n. 59, *supra*.
[84] *Calhoun*, doc. 321-1, 7(B)(i).

both the City and the Judiciary. Conflicts of interest arising from misuse of the contempt process directly affect the Judiciary because contempt orders are a critical enforcement tool that belong to the courts.

The United States Supreme Court, in *Young vs. Vuitton*, addressed the important role of contempt orders as a means of judicial enforcement. [85] The *Young* holding applies to prosecutors of *criminal* contempt actions; thus, the constitutional protections accorded to criminal proceedings are an element of *Young* that is inapplicable to the instant case.[86] Nonetheless, the Court's reasoning addresses the importance of integrity in contempt proceedings, which is the tool belonging to the judiciary for enforcement of its orders.[87] The Court's reasoning illuminates the underlying conflict of interest that Counsel is capitalizing on in the instant matter.

The *Young* contempt arose from the settlement of a civil action, in which Louis Vuitton sued the Defendant, Klaymincs, for trademark infringement by manufacturing and selling imitation Vuitton goods. The 1982 settlement included an injunction that prohibited Klaymincs from any future activity which violated

---

[85] *Young vs. US ex rel. Vuitton*, 481 US 787 (1987); *see also Mine Workers v. Bagwell*, 512 U.S. 821 (1994).

[86] *Young*, 481 US at 813-814.

[87] *Id*. at 796 ("The ability to punish disobedience to judicial orders is regarded as essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches").

Vuitton's trademark rights. [88] In 1983, Vuitton was notified of an ongoing undercover "sting operation" which found Klaymincs to be infringing upon the Vuitton trademark, in violation of the injunction.[89] Vuitton's attorneys petitioned the court for permission to participate in the undercover operation, and for appointment as special counsel to prosecute a criminal contempt action against Klaymincs for violation of the court's order.[90] The court granted the attorney's petition, the sting operation was successful and Klaymincs was convicted for criminal contempt of the court's injunction.[91]

The Supreme Court reversed the contempt conviction, holding that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order".[92] The Court explained that contempt is a means for the judicial branch to enforce its decisions. "The underlying concern that gave rise to the contempt power was . . . disobedience to the orders of the Judiciary".[93] The "fundamental purpose is to preserve respect for the judicial system itself".[94]

---

[88] *Id.* at 790-791.
[89] *Id.* at 791
[90] *Id.*
[91] *Id.* at 792.
[92] *Id.* at 790.
[93] *Id.* at 798.
[94] *Id.* at 800.

## A.  Counsel's Role as *Calhoun* Compliance Monitor is Tarnished by Conflicts of Interest

The Court stated that within the context of criminal contempt, the prosecutor "pursue[s] the public interest in vindication of the court's authority.  A private attorney appointed to prosecute a criminal contempt therefore certainly should be as disinterested as a public prosecutor who undertakes such a prosecution".[95] Though a civil contempt action is a less severe enforcement tool, it is nonetheless an action taken by the court to enforce its orders.

> While a court has the authority to initiate a prosecution for criminal contempt, its exercise of that authority must be restrained by the principle that only the least possible power adequate to the end proposed should be used in contempt cases. . . .  We have suggested, for instance, that, ...a trial judge should first consider the . . . imposition of civil contempt, utilizing criminal sanctions ... only if the civil remedy is deemed inadequate . . . .[96]

As monitors of the *Calhoun* Court Orders, Counsel acts on behalf of the Court; Counsel acknowledges that they have a "court ordered obligation and [have] been doing it".[97] Though impartiality is imperative to the integrity of that responsibility, Counsel readily acknowledge their ongoing communication with the *Calhoun* Plaintiffs and commitment to ascertaining that Plaintiffs receive the

---

[95] *Id*. at 804.
[96] *Id*. at 801(internal citations omitted).
[97] Transcript @ 30:21- 31:8.

"benefit of their [settlement] bargain".[98]    The *Young* Court's position on the simultaneous representation is decisive.

> In a case where a prosecutor represents an interested party, however, the ethics of the legal profession require that an interest other than the Government's be taken into account. Given this inherent conflict in roles, there is no need to speculate whether the prosecutor will be subject to extraneous influence.[99]

Counsel's conflict of interest is exacerbated by their representation of Plaintiffs in the four Active Lawsuits, which rely on the *Calhoun* and *Anderson* Contempt Orders to support Federal Claims.

> If a Justice Department attorney pursued a contempt prosecution for violation of an injunction benefiting any client of that attorney involved in the underlying civil litigation, that attorney would be open to a charge of committing a felony under [18 USC] § 208(a). Furthermore, such conduct would violate the ABA ethical provisions, since the attorney could not discharge the obligation of undivided loyalty to both clients where both have a direct interest. The Government's interest is in dispassionate assessment of the propriety of criminal charges for affronts to the Judiciary. The private party's interest is in obtaining the benefits of the court's order. While these concerns sometimes may be congruent, sometimes they may not. A prosecutor may be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client.[100]

The harm done by Counsel's misuse of its monitoring authority extends not only to the City and its taxpayers, it also extends to the integrity of the judicial system.

---

[98] Transcript @ 125: 20-25.
[99] *Young* at 807.
[100]  *Id*. at 805.

**B.**    **Counsel's Request for Contempt Orders to Benefit New Clients Violates Georgia Rules of Professional Conduct**

Counsel filed the *Ruch*, *Croland* and *Gates* Lawsuits four months after receiving the Contempt Orders in *Calhoun* and *Anderson*.[101]    It is clear that Counsel intended to use the *Calhoun* and *Anderson* Contempt Orders to form the basis of the *Ruch*, *Croland* and *Gates* Lawsuits.  By not informing the *Calhoun* and *Anderson* Courts of their intended use of the Contempt Orders, Counsel utilized the judiciary's contempt power to inappropriately promote their own economic interests.[102] Georgia's Rules of Professional Conduct mandate attorney candor to the court; Counsel's failure to inform the *Calhoun* and *Anderson* Courts of their intended use of the Contempt Orders was a deceptive omission of material fact that violates Georgia's ethics standards for attorneys.[103]

Counsel make additional false statements of material fact in the complaints of the Active Lawsuits, by intentionally mischaracterizing the *Anderson* and

---

[101]  Each of the Active Lawsuits seeks attorneys' fees as one of the requested remedies.  *Croland*, doc. 22; *Gates*, doc. 18; Ruch, doc. 32; *Toole*, doc. 1.

[102]  Georgia Rules of Professional Conduct, Rule 3.3 (Candor Toward the Tribunal) Subsection (a)(1) ("A lawyer shall not knowingly: make a false statement of material fact or law to a tribunal").

[103]  *See id*.

*Calhoun* Contempt Orders to establish the Federal Claims.[104]    APD does not dispute that, between 2012-2014, it failed to meet *technical* requirements of the "*Calhoun* Training" and "*Anderson* Training" despite APD's extensive training during that time period.[105] That said, between 2012-2014, APD performed Department-wide Trainings which included instruction on the constitutional requirements at issue in *Calhoun* and *Anderson*.[106]    In addition, the State of Georgia mandates fulfillment of specific training requirements in order to receive and maintain Georgia Peace Officer Standards and Training certification.[107]    As required and enforced by the State, APD fulfills these State training mandates.

The *Anderson* and *Calhoun* contempt orders reflect specifically and solely on compliance with the *Anderson* and *Calhoun* Court Orders.[108] The City's performance of other training, its commitment to training generally, and its good faith belief that the required *Calhoun* Training and *Anderson* Training were performed, are irrelevant in a contempt proceeding.  As expressed by the Eleventh

---

[104]  *Ruch* Amended Complaint, ¶¶ 69, 70, 76, 77; *Croland* Amended Complaint, ¶50-52; *Gates* Amended Complaint, ¶¶ 65, 73, 74; *Toole*, doc. 1, ¶¶ 57, 58, 64 and 67.

[105]  *See* n. 28, *supra.*

[106]  *See e.g.* n. 26, *supra.*

[107]  O.C.G.A. § 35-8-21.

[108]  *See Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990)("Every civil contempt proceeding is brought to enforce a court order that requires the defendant to act in some defined manner").

Circuit Court of Appeals, and relied upon by Counsel in the *Anderson* Contempt Motion, "the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue".[109]

At the time of filing their contempt motions, Plaintiffs' Counsel knew that the City was training on the constitutional issues related to *Calhoun* and *Anderson*,[110] and knew that the City mistakenly believed it had complied with the *Calhoun* and *Anderson* training requirements.[111]   At the time of filing the Active Lawsuits, as *Calhoun* monitors, Counsel was able to determine the full breadth of APD training preceding the 2014 arrests.   Nonetheless, to support the Federal Claims in the Active Lawsuits, Counsel knowingly mischaracterized the contempt orders as demonstrating a pervasive failure to train and longstanding callousness toward protecting individual liberties.[112]

---

[109] *Anderson*, doc. 17 at 5-6 (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)).

[110] *See* n. 26, *supra.*

[111] *See* n. 27, *supra.*; *see also Calhoun* doc. 281 at 12 (In their Contempt Motion, Counsel state that "they asked the City if the [2013 Calhoun] training had been accomplished.  . . .  In response, the City provided documents that, the City claimed, demonstrate compliance with this training requirement. . . .  But, these documents do not show compliance and actually suggest the lack of it").

[112] *Ruch* Amended Complaint, ¶¶ 69, 70, 76, 77; *Croland* Amended Complaint, ¶¶ 50-52; *Gates* Amended Complaint, ¶¶ 65, 73, 74; *Toole*, doc. 1, ¶¶ 57, 58, 64 and 67.

## VII. City's Requested Relief

The City respectfully requests that this Court take the actions necessary to eliminate Counsel's ability to utilize its dual roles to prejudice the City and unfairly advance its economic and strategic interests. The City has considered potential methods of achieving this result with approaches modeled after the Special Master appointment in *Calhoun*. To that end, the City respectfully suggests that: 1) the *Ruch*, *Toole*, *Croland* and *Gates* Lawsuits (the "Active Lawsuits") be transferred to one Judge, and specifically to either Judge Jones or Judge Batten, the Judges for the *Anderson* and *Calhoun* cases respectively; 2) that a Magistrate Judge or special master be assigned to oversee and manage the discovery processes of the Active Lawsuits[113]; 3) that the discovery and legal determination regarding the 42 USC §1983 claims in the Active Lawsuits be consolidated; 4) that there be no change to the current status of *Calhoun*, as it pertains to Mr. Joseph Whitley serving as a Special Master to monitor and facilitate the City's compliance efforts; and 5) that Counsel be removed as

---

[113] The posture of each Lawsuit differs, and therefore the timing of discovery will vary by Lawsuit. *See* n. 22-25, *supra*.

monitors of *Calhoun* compliance, such that Mr. Whitley is the sole compliance monitor in the Lawsuit.[114]

## VIII.  Conclusion

The City's requests herein would promote transparency of Plaintiffs' Counsel, benefit the efficient operations of the Court, protect taxpayer dollars and cause no prejudice to the parties.

Respectfully submitted this 17th day of January, 2017.

**CATHY HAMPTON**
City Attorney
Georgia Bar No. 321899

**ROBIN JOY SHAHAR**
Chief Counsel
Georgia Bar No. 089435
rshahar@atlantaga.gov
(404) 546-4171 *direct*

**ALISHA WYATT-BULLMAN**
Assistant City Attorney
Georgia Bar No. 189850
aiwyattbullman@atlantaga.gov
(404) 546-4125 *direct*

---

[114] The City has raised the first three items with Mr. Weber and/or with both of Plaintiffs' Counsel.    Counsel have expressed opposition to all three suggestions, except that they "would be willing to consider some form of coordinated discovery" regarding the issues of municipal liability in *Croland*, *Ruch* and *Toole*. *Ruch*, doc. 59 at 1-2.

**MAIYSHA R. RASHAD**
Assistant City Attorney
Georgia Bar No. 836938
mrrashad@atlantaga.gov
(404) 546-4086 *direct*

Attorneys for Defendants

City of Atlanta Law Department
55 Trinity Avenue SW Suite 5000
Atlanta, GA  30303-3520
(404) 546-4100 *main*

## CERTIFICATION

Counsel for Defendants certifies that this Brief has been prepared with Times New Roman font, 14 point, and therefore it complies with the requirements of L.R. 5.1(C).

Respectfully submitted, 17th day of January, 2017.

**CATHY HAMPTON**
City Attorney
Georgia Bar No. 321899

By:
**ROBIN JOY SHAHAR**
Chief Counsel
Georgia Bar No. 089435
rshahar@atlantaga.gov
(404) 546-4171 *direct*

**ALISHA WYATT-BULLMAN**
Assistant City Attorney
Georgia Bar No. 189850
aiwyattbullman@atlantaga.gov
(404) 546-4125 *direct*

**MAIYSHA RASHAD**
Assistant City Attorney
Georgia Bar No. 836938
mrrashad@atlantaga.gov
(404) 546-4086 *direct*
Attorneys for Defendants

City of Atlanta Law Department
55 Trinity Avenue SW Suite 5000
Atlanta, GA  30303-3520
(404) 546-4100 *main*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GEOFFREY CALHOUN, et al. | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 1:09-CV-03286-TCB |
| v. | ) | |
| | ) | |
| RICHARD PENNINGTON, et al. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| FELICIA ANDERSON | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 1:11-CV-3398-SCJ |
| v. | ) | |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| CAROLINE CROLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 1:15-CV-03303-RWS |
| CITY OF ATLANTA and STEPHENSON CAMILLE, | ) | |
| | ) | |
| Defendants | ) | |

44

| | | |
|---|---|---|
| AUSTIN GATES, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO.: |
|     v. | ) | 1:15-CV-03307-LMM |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
|     Defendants. | ) | |

| | | |
|---|---|---|
| JOHN RUCH, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
|     v. | ) | 1:15-CV-03296-MHC |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
|     Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| COREY TOOLE | ) | |
| | ) | |
|     Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:16-CV-02909-CAP |
|     v. | ) | |
| | ) | |
| CITY OF ATLANTA, et al. | ) | |
| | ) | |
|     Defendants. | ) | |

## **CERTIFICATE OF SERVICE**

    I hereby certify that on January 17, 2017, I electronically filed the forgoing

Brief with the Clerk of Court using the CM/ECF system with service on all

attorneys of record electronically.

By:_____

**ROBIN JOY SHAHAR**
Chief Counsel
Georgia Bar No. 089435
rshahar@atlantaga.gov