# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| GEOFFREY CALHOUN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Miscellaneous Matter Number |
| v. | ) | 1:17-mi-00004-RWS-RGV |
| | ) | |
| CITY OF ATLANTA, et al. | ) | Also Filed in: |
| | ) | 1:09-CV-03286-TCB |
| Defendants. | ) | 1:11-CV-03398-SCJ |
| | ) | 1:15-CV-03303-RWS |
| | ) | 1:15-CV-03307-LMM |
| | ) | 1:15-CV-03296-MHC |
| | ) | 1:16-CV-02909-CAP |
| | ) | |
| | ) | |

## RESPONSE TO PETITION FOR EMERGENCY RELIEF

The "Petition for Emergency Relief" rests on two assertions: (i) that attorneys Weber and Grossman were appointed as neutral "monitors" by the Hon. Judge Timothy C. Batten, Jr. in *Calhoun*; and (ii) that "the sole basis for the Federal Claims in the Active Lawsuits is the *Calhoun* contempt order and *Anderson* contempt order."[1]  Neither of these assertions are truthful. Indeed, as will be shown below, both are false and violate both their propounding counsels'

---

[1] Brief in Support of Petition for Emergency Relief (hereinafter Def. Brf.) at 10, 19 ("sole basis") and 21, 29, 30 ("court appointed monitors").

duty of candor to the Court and the requirements of Rule 11 of the Federal Rules of Civil Procedure.

More than six years after a Consent Order was entered in *Calhoun* requiring the City of Atlanta to implement certain procedural reforms, and deep into litigation in four other new cases (which the Defendants call the "Active Lawsuits"), the collective Defendants in six cases have filed an untimely extraordinary Emergency Petition seeking to dismiss Plaintiffs' counsel from the *Calhoun* case, in which the City was twice held in contempt.  (The City also complains of Plaintiffs' counsel's enforcement actions in the *Anderson* case, in which the City was also held in contempt for violating the Court's consent decree).   In addition, without citing any authority whatsoever, the City seeks the extraordinary remedy of removing four federal judges from the four "Active Lawsuits" (having lost two motions to dismiss on both municipal liability and individual liability claims, and while their own appeal in one case is outstanding), to be re-assigned to one or two judges of their choosing.[2]

---

[2]     Among the many procedural and rule violations exhibited by the Emergency Petition, their brief is 17 pages longer than Local Rule 7.1(D) allows. The Defendants have now exceeded the total length for briefing for both an original and a reply brief.  Plaintiffs do not seek to strike this brief, because that will only result in further delay.

The Defendants filed this extraordinary motion with the Chief Judge only one day before a conference in one of the four Active Lawsuits (*Ruch*), immediately after which discovery in that case would have commenced.  In support of their motion they cite a single inapplicable case, misrepresent the record(s) in several cases, and claim violations of unspecified ethical rules.[3]

Attached to this filing are the Affidavits of ethics professors and national leaders in systemic civil rights litigation who confirm that the premise of the City's Motion is not only untrue, but legally impossible:

(1) Plaintiffs' counsel have an ethical obligation to their clients to zealously enforce an injunctive relief order,

(2) Federal Rule of Civil Procedure 53 is the only vehicle by which a "neutral" court monitor may be appointed, and

(3) Plaintiffs' counsel enforcing an injunctive relief order for their clients <u>cannot</u> be appointed as a "neutral" monitor because they have an ethical duty to zealously enforce a court order for their clients and because the

---

[3]     Throughout each of the six cases that are the subject of the instant motion, Defendants have never cited (or verbally provided) a single ethical rule that they believe has been violated, and even now only obliquely cite in a footnote to a single rule.   When Defendants raised the issues herein, Plaintiffs' counsel represent that they both consulted with the State Bar and law school ethics professor concerning the issues raised.  On information and belief, Defendants have not done so, nor did they seek a Formal Advisory Opinion from the State Bar of Georgia.

federal rules and 28 U.S.C. § 455 (b)(2) both <u>prevent</u> appointment of Plaintiff's counsel as the court's own monitor.

Most importantly, as a simple matter of fact, <u>no court order in any of the six cases at issue has ever appointed Plaintiffs' counsel to serve as a "neutral" court appointed monitor</u>.[4]

Professor Lawrence Fox is an ethics professor at Yale Law School who supervises the Ethics Bureau at Yale (Yale's ethics legal clinic).  Professor Fox is the former managing partner at Drinker Biddle & Reath LLP, and former Chair

---

[4]     In response to Defendant's current filing, Counsel Weber has repeatedly requested in writing a citation to the order that Defendants' claim resulted in Plaintiffs' counsel being appointed as a "court appointed monitor" as they repeatedly claim is Plantiffs' counsels' role.   Email 01/23/17:

> Robin,
> This will be the last time I ask this question, as I have asked twice already, but I want to confirm that you will not be providing a response to the following question:  It would be helpful, as you refer to us as "court appointed monitors" to tell us what order and statute made us so.
> Thanks,
> Gerry

No response was ever given, because there is no such court order and 28 U.S.C. § 455 (b)(2) prevents any "lawyer in the matter in controversy" from serving as a court appointed neutral monitor.   The only response, dated 01/23/17 from Shahar was: "My response is that you personally have answered this question, as has Dan.  I request that you not email about this question again.  Thanks. Robin" Emails are attached hereto as Exhibit D.

of both the American Bar Association (ABA) Standing Committee on Ethics and Responsibility and the ABA Section on Litigation.  *Fox Decl.* ¶¶ 1-4 (Exhibit B).

Among the many findings in Professor Fox's detailed affidavit: (1) "Plaintiffs' counsel were never neutral, court appointed monitors, nor could they have legally been appointed as such," *id.* ¶¶ 6, 7, 10-12, 14-31, (2) "Rules of Professional Conduct prevent lawyers for one party in a representation from taking on a neutral monitor role" because of their "duty of loyalty" as "zealous advocates" and a "continuing duty … to assure compliance with the District Court's orders;" *id.* ¶¶ 14-31; (3) "it is outrageous to even suggest that Plaintiffs' counsel deceptively gamed the system and undermined the integrity of the judicial system," *id.* ¶ 25-29.

Turning to conduct of the Defendants' counsel and the appropriateness of Rule 11 sanctions for the filing of this Emergency Petition, Professor Fox finds "I have concluded to a reasonable degree of certainty that **this is one of the most serious breaches of the limits of proper advocacy I have ever encountered**." *Id.* ¶ 7 (emphasis added).  His conclusion that Rule 11 sanctions are appropriate is premised on (1) "the professional responsibility implications of the request by these lawyers that one of two hand-picked judges should handle these cases going forward" -- Defendants "judge-shopping" "impermissibly seeks to influence the judicial selection process" and is a "cynical manipulation of the

judicial system;" *id.* ¶¶ 7, 25, 38, 43-46 (2) that the "outrageous" disqualification of counsel request here is an "entirely unacceptable" attempt to "disqualify lawyers when no conflict of interest exists;" *id.* ¶¶ 13, 25, 39; (3) that the accusations made regarding confidentiality of legal strategy are so "irresponsible" that they violate Ga. Rules of Prof'l Conduct 3.1 prohibiting the advancement of a legal position "to harass or maliciously injure another;" *id.* ¶¶ 6, 7, 36, 37; (4) that the laches and delays in filing the Emergency Petition as well as the "bizzare" remedies it seeks and its lack of legal and factual support demonstrate that the Emergency Petition was filed solely for "improper purposes" of "harassment" and "delay" in violation of Ga.Rules of Prof'l Conduct 1.7. *Id.* ¶¶ 6, 7, 13, 38-42, 47.

Professor David Rudovsky is one of the most highly regarded police misconduct practitioners and scholars in the country, who has argued numerous cases regarding police misconduct and served as plaintiff's counsel to monitor and ensure compliance with numerous systemic reform decrees involving police departments across the country.   He has argued two key cases in the United States Supreme Court and has written the primary text in this field, *Police Misconduct: Law and Litigation.*  *Rudovsky Decl.* ¶¶ 2-7, 9 (Exhibit A).  He explains the separate and "neutral" role of court appointed monitors "by distinct contrast" to the "obligation" of "advocates" for the plaintiff to enforce court

orders.  Indeed, he notes that plaintiffs' counsel cannot serve as court appointed monitors.  *Id.* ¶ 8. He is aware of no systemic relief order in the country "where counsel could not seek enforcement measures by contempt of court or other means where necessary."  *Id.* ¶ 9.

In other words, the entire foundation of the City's motion is pure fiction—and factually false and legally impossible. *Fox Decl.* ¶ 40 ("the motion to disqualify is blatantly tactical, made in bad faith").

## COURSE OF PROCEEDINGS

Plaintiffs in *Calhoun* first sought contempt against the City in 2011, over three years before any of the arrests in the new currently pending lawsuits even occurred.  As the result of media coverage of the Atlanta police department's response to several "Ferguson-related" protests in November 2014 , and several unjustified arrests during those protests where criminal charges were dismissed, Grossman and Weber became aware that the City was still not complying with orders issued in *Calhoun* and *Anderson.*  Grossman and Weber agree with the City's contention that the 2014 arrests made them aware there might still be problems with compliance with the *Calhoun* and *Anderson* orders.  Grossman and Weber had the obligation to their *Calhoun* and *Anderson* clients (as counsel for those plaintiffs, <u>not</u> as "neutral" court-appointed monitors) to ensure compliance with existing injunctive relief orders.  To fulfill their duty to those

clients, and after further investigation that confirmed the City's violation of the *Calhoun* and *Anderson* orders, Plaintiffs' counsel sought contempt relief. Contested contempt orders were entered by the Courts in both *Calhoun* (Hon. Judge Batten) and *Anderson* (Hon. Judge Jones), finding violations of both injunctive relief orders and entering sanctions against the City of Atlanta.[5]

Both counsel Grossman and Weber were contacted by attorneys for several criminal defendants who had been arrested during the protests about co-counseling on potential new civil rights actions relating to these arrests, and Weber agreed to assist in four such cases and Grossman on three such cases now pending in this District.

Defendants repeatedly state in their extraordinary motion that "[the four] Active Lawsuits rely on the *Anderson* and *Calhoun* Contempt orders as the sole basis for federal claims." Def. Brf. at 10, 19. Even a cursory review of the Complaints in these four actions clearly demonstrate the falsity of this statement.

Three of these new cases were filed in September 2015, yet despite filing Answers and Motions to Dismiss, the City never sought to consolidate, assert permissive joinder, or even identify them as related cases. That was with good reason, because: (1) there are various theories of liability against the different

---

[5]       The three successful orders regarding contempt are: *Calhoun* [Doc. 280] (Contempt Resolution); *Calhoun* [Doc. 289] (Contempt Order); *Anderson* [Doc. 31] (Contempt Order).

individual officers (including the officers who physically made the arrests, supervising officers, and commanding officers who ordered certain arrests) with regard to the separate arrests of the different plaintiffs at different times in different places and under different factual situations; (2) there are different federal claims in several cases, including (in *Gates*) federal statutory claims and claims associated with the application of the Georgia anti-mask law, which is completely unrelated to any issue in any of the other cases;[6] and (3) as has been repeatedly emphasized to the City, the municipal liability theories vary from case to case, including final policy maker liability and deliberate indifference to training regarding the offense of disorderly conduct, and both have little to do with the issues or Contempt Orders in *Calhoun* or *Anderson*.[7]

---

[6]     The issues in *Gates* -- that Atlanta police officers unlawfully arrested him for non-threatening, politically-expressive mask wearing in violation of the clearly established law set forth in two Georgia Supreme Court decisions, and that this arrest was the result of a final policy maker's order given to all officers at the protest -- is so untethered from *Calhoun* or *Anderson* as to rather suggest the Defendants included *Gates* in their list of cases to consolidate and stay not because of the factual or legal issues in that case, but because of the identify of Mr. Gates' counsel and the Defendants' desire to frustrate and delay counsel who have a seven year track record of diligence and success in litigation against the City of Atlanta with regard to police issues.

[7]     A chart is provided as Exhibit C, identifying the claims in each case and the individual and municipal liability theories in each case.  Nevertheless, throughout their brief, Defendants state that the "Sole basis of Federal Claims = *Calhoun* and *Anderson*  Contempt Orders."  Def. Brf. at 10.

Nor are the *contempt findings* themselves the key factual basis for Plaintiffs' claim of municipal liability arising from the City of Atlanta's failure to train officers about the right of the public to photograph and video record police activity: the provable fact that the City violated the *Calhoun* and *Anderson* orders by failing to train officers establishes the City's municipal liability *whether or not contempt was ever ultimately issued*, since the initial injunctive relief orders in *Calhoun* and *Anderson* themselves put the City on clear notice of the need to train and their "deliberate indifference" in failing to thereafter conduct required training.  The findings of contempt in *Calhoun* and *Anderson*, based on failure to train, is simply one additional piece evidence supporting the City's deliberate indifference with regard to *one* training theory in *Croland, Ruch* and *Toole*.

Plaintiffs do agree that this one municipal liability theory (among several) is common to at least three of the four Active Lawsuits, which is why Plaintiff's counsel articulated an option for coordinated discovery on that one issue:

> [T]he arrests in each of the [belatedly] claimed "related cases" involved different ordinances and statutes, many different defendants, different timeframes, different municipal liability theories and many different legal claims.  However, one municipal liability in *Croland, Ruch* and *Toole* presents several common issues for discovery and, for efficiency, Plaintiff would be willing to consider some form of coordinated discovery for those issues.  *Ruch Joint Plan* [Doc. 59 at 2].

Defendants refused even to discuss the possibility of coordinating discovery on this one common issue, however, and instead filed an extraordinary petition asking the Chief Judge to consolidate four otherwise unrelated cases.

## ARGUMENT AND CITATIONS OF AUTHORITY

Defendants are clearly unhappy that: (1) they have been held in contempt three times, (2) they lost *Calhoun* and *Anderson,* and with respect to the former are still not in compliance six years later, and (3) they have lost motions to dismiss in both *Gates* and *Ruch* and now face discovery over municipal liability.  The City's solution is an extraordinary petition to remove counsel in *Calhoun* who have zealously enforced their clients' rights; to remove four active cases from the four judges who were assigned to them, including two who have already ruled against them; to re-assign those cases to one of two judges of their own choosing; and to stay discovery in all four new cases.

In this brief and the detailed declarations of Professors Fox and Rudovsky the undersigned show that counsel have fulfilled their duties to all their collective plaintiffs, that the interests of all plaintiffs in all cases are not conflicting, that there is no plausible ethical violation and that the extraordinary motion should be denied in toto.  Moreover, because Defendants' motion is flatly contradicted by the record and clear law, including a clear statute that explicitly precludes Plaintiffs' counsel from serving as a neutral court monitor, and

because Defendants repeatedly and knowingly make false statements of fact, even after Counsel Weber's own repeated requests for correction, the Court should very seriously consider the imposition of Rule 11 sanctions. *Fox Decl.* ¶ 6 ("the motion to disqualify is not for the purpose of addressing a real ethical problem, but transparently to seek a tactical advantage").

I.    **THE ROLE OF PLAINTIFFS' COUNSEL IS TO ZEALOUSLY ADVOCATE FOR FULL COMPLIANCE – THEY ARE NOT "COURT-APPOINTED MONITORS" UNDER RULE 53.**

The role of Grossman, Weber (and Nevins) in *Calhoun* is as Plaintiffs' counsel and to zealously ensure that the injunctive relief orders they obtained for their clients are fully honored.  Defendants brief reflects a fundamental misunderstanding of the role of a "court-appointed monitor" under Federal Rule of Civil Procedure 53 versus the role of plaintiffs' counsel in ensuring compliance with injunctive relief orders.

Plaintiffs' counsel here were engaged <u>as plaintiffs' counsel</u> in post-judgment efforts related to enforcement of injunctions to ensure compliance with the court's order.  *See, e.g.*, *Martin v. Haddix,* 527 U.S. 343 (1999) (recognizing the role of plaintiffs' counsel in post-judgment monitoring of the defendants' compliance with remedial decrees); *Adams v. Mathis,* 752 F.2d 533, 534 (11th Cir. 1985) (recognizing role of plaintiffs' counsel in "post-judgment efforts were related to enforcement of an injunction to ensure compliance with the court's

order"); *Wyatt ex. rel, Rawlins v. Sawyer*, 67 F..Supp2d 1331, 1345 (M.D. Ala. 1999)

(recognizing plaintiffs counsel's role in "monitoring the implementation of, and

securing compliance with, the injunctions and the consent decree"); *Keith v.*

*Volpe*, 833 F.2d 850, 855-856 (9th Cir. 1987) (collecting cases on subject,

recognizing "post-judgment monitoring by the Center was, therefore, 'a

necessary aspect of plaintiffs' 'prevailing' in the case'").[8]Weber and Grossman

are advocates for their clients and were <u>never</u> appointed as "neutral" monitors. [9]

---

[8]    The quasi judicial role of a special master differs greatly from the role
plaintiffs' counsel may play in enforcing compliance. Courts have long
recognized the advocate role plaintiff's counsel plays in enforcing favorable
judgments for their clients, a role which serves to advance the <u>clients'</u> interests.
Plaintiffs' counsel conducts various investigative and compliance services which
are compensable as part of the formal representation of their clients, most
notably recognized in the cases cited above under 42 U.S.C. § 1988.  *Rudovsky
Decl.* ¶¶ 6-11 (explaining in detail the roles of court appointed monitor and
plaintiffs' counsel).

[9]    Counsel Weber attempted to explain to Defendants the advocate role of
plaintiffs' counsel in enforcement as distinguished from the role of a Special
master as neutral court monitor on a number of occasions, including the meeting
videotaped by Defendants. [*See* Doc. 1-2, Exhibit B, Transcript 110-116, 124-130].

    In April 2016, Counsel-Weber even provided opposing counsel with a
copy of the *Academy of Court Appointed Masters Handbook* (2d Edition) also
available at: http://www.courtappointedmasters.org/types-appointments.  This
Handbook clearly explains the  process for appointment and delineates the role
of the court appointed monitor versus the role of the parties to the litigation.
Section 3 of the Handbook further delineates the ethical restrictions on
appointment and duties of a court appointed monitor and explicitly cites the
very federal law that prohibits plaintiffs' counsel from ever being appointed a
court monitor in their own case.

Indeed, as Plaintiffs first suggested in 2009,[10] and because compliance with the *Calhoun* order was still not complete over five years after its issuance, former United States Attorney Joe Whitley has been appointed by Judge Batten to serve as the court appointed neutral monitor who was specifically charged with an impartial fact-finding role in *Calhoun*. *See generally United States v. Jefferson Cty.*, 2013 WESTLAW 4482970, *12 (N.D. Ala. 2013); *EEOC v. Joe's Crab Shack*, 15 F.Supp.2d 1364 (S.D. Fla. 1998).[11]

There is simply no order assigning the Plaintiffs' counsel to engage in, as the City puts it, "*simultaneous representation of the Court and plaintiffs*" and *Calhoun's* plaintiffs' counsel were <u>never</u> "court appointed monitors."   Def. Brief

---

[10]   Defendants falsely state that they first suggested a Special Master in *Calhoun*, but the actual fact is that Plaintiffs sought a special master in that case during negotiations of a settlement but that Defendants rejected the appointment of a Special Master:

> [W]e proposed that the Justice Department be a monitor or that there be another monitor, the City was opposed to that request when we talked in settlement discussions…. So the City said no, no, no, no.  Now, there's been seven years of [plaintiffs'] monitoring, two contempt orders, and in that time there's so substantial noncompliance that on the forms issue we have seven of 1800 [officers] complying.  [Doc 1-2, Exhibit B, Transcript at 124-125].

[11]   Defendants' Emergency Motion is itself a violation of the Rule 53 process. "The party objecting to the appointment of a master usually had to make a timely objection either at the time of appointment or promptly thereafter to preserve the assignment of error." *See* "Special Masters in the Federal Courts," SL083 American Law Institute – American Bar Association Continuing Legal Education, 619, 628 (2005).

at 21, 29, 30 (alleging "failure to separate their litigation role from their role as court appointed monitors").  Indeed, Counsel for the Plaintiffs could not serve in the role of court-appointed monitors, because they must zealously represent the interests of their clients, and cannot serve as what the City terms a "neutral compliance monitor." *Id.*  Plaintiffs' counsels' role is to zealously advocate for full compliance, and they are, by definition, not neutral in that role. *Fox Decl.* ¶¶ 6, 7, 10-12, 14-31; *Rudovsky Decl.* ¶ 8.

Indeed, in order to serve as a court appointed monitor, one must meet the requirements of Federal Rule of Civil Procedure 53.  Critically, one must meet the neutrality qualification requirements of 28 U.S.C. § 455.  The advisory committee notes to Rule 53 specifically state:

> Masters are subject to the Code of Conduct for United States Judges, with exceptions spelled out in the Code. Special care must be taken to ensure that there is no actual or apparent conflict of interest involving a master. The standard of disqualification is established by 28 U.S.C. § 455.

Under 28 U.S.C. § 455 (b)(2) any "lawyer in the matter in controversy" is specifically underlined excluded from serving as a court appointed neutral monitor. *Fox Decl.* ¶¶ 6, 7, 10-12, 14-31; *Rudovsky Decl.* ¶ 8.

*United States v. Apple, Inc.,* for example, explores in detail the neutrality requirements of a "court appointed monitor" and indicates that it would be both impermissible and "remarkable" that as "an arm of the court [a court appointed

monitor] would litigate on the side of a party" 787 F.3d 131, 138-141 (2d Cir. 2015).[12]  As *Apple* emphasizes, the court appointed monitor has a unique neutral role and cannot "[trample] rights of counsel and adversarial principles." *Id.* at 141.  *See also* A. Miller, 9C *Federal Practice and Procedure* Section 2602.2, 2607 and 2610 (3d Ed.) (elaborating on the role of the parties and the court appointed monitor in compliance and noting that litigants cannot serve in the neutral role).

The City's fundamental misunderstanding of the advocate role of Plaintiffs' counsel in enforcing consent orders is fatal to their emergency motion. The City is flat wrong when it described the Plaintiffs' counsel as "simultaneous represent[ing] of the Court and plaintiffs." Def. Brief at 21, 29, 30.  When seeking contempt, and now with respect to the Special Master, the role of Plaintiffs' counsel is to advocate for their clients.  Grossman, Weber and Nevins fulfilled their duties to their clients in *Calhoun* and *Anderson* by seeking and successfully obtaining contempt orders and continuing to investigate compliance in *Calhoun*. *Fox Decl.* ¶¶ 6, 7, 10-12, 14-31; *Rudovsky Decl.* ¶¶ 8, 11.

---

[12]     The *Apple* decision also explains that a court appointed monitor is subject to the requirements of the Code of Conduct for United States Judges.  787 F.3d at 140.

II.   **JOINDER OF THE NEW CASES IS UNTIMELY, NOT PERMISSIBLE UNDER THE FEDERAL RULES OF CIVIL PROCEDURE, AND WILL IMPERMISSIBLY REMOVE CASES FROM ASSIGNED JUDGES**

The motion is patently untimely, and the process utilized is wholly inconsistent with the Federal Rules of Civil Procedure.  In the four new cases, as well as *Anderson* and *Calhoun*, Defendants have failed to file a single Notice of Related Case, or a Motion to Consolidate, or a Motion for Permissive Joinder. They have had years to do so.  Instead, they belatedly file this extraordinary motion that seeks to join six cases that involve different ordinances and statutes, many different defendants, different timeframes, different municipal liability theories and different legal claims.  The Defendants also, without explanation, request that all new cases be transferred to a single one of two judges of their choosing.[13]  Moreover, as to *Calhoun*, there were proper methods to raise any concerns but Defendants both consented to orders <u>and</u> never raised the issues herein for years.[14]  *Fox Decl.* ¶¶ 6, 7, 13, 38-42, 47 (Emergency Petition filed for "improper purposes").

---

[13]    The *Anderson* case was resolved without any discovery, but inexplicably the Defendants seek to have all cases transferred to the judge whose case was finally disposed of in a final order in March 2012 [*Anderson* Doc. 16] or the judge in *Calhoun* rather that any of the four judges with active cases.

[14]    Since Defendants are, in effect, complaining about the role of Plaintiffs' counsel as set forth in the May 19, 2015 Court Order, it is important to note that the City of Atlanta <u>consented</u> to that Order, and that at the time the City

Plaintiffs have even offered solutions for discovery, but Defendants refused to engage.  Plaintiffs recognized that "one municipal liability in *Croland, Ruch* and *Toole* presents several common issues for discovery and, for efficiency, Plaintiffs have offered to consider some form of coordinated discovery" for those issues (even though there are logistics problems as the four cases are on entirely different discovery tracks).[15]  Rather than engage, Defendants filed this motion without even attempting to discuss the coordinated discovery proposed by

---

consented to the Order it knew that Plaintiff's counsel, not surprisingly, represented the Plaintiffs and had an ethical duty to zealously advocate for the Plaintiffs. If the City had any concerns about the role of Plaintiffs' counsel in the May 19, 2015 Order the City should have presented those concerns to the *Calhoun* Court (the Hon. Judge Batten). Instead, the City of Atlanta not only *consented* to the May 19, 2015 order, but *operated* under it for almost a year.

In June 2016 the City of Atlanta then consented to the entry of a Special Master Order under which the provisions of the May 19, 2015 order "remain unchanged." *Calhoun* [Dkt. 309 at 2]. In other words, the City of Atlanta is now contesting – in an "emergency" petition – the terms of a court order to which the City consented *twice* during the past year-and-a-half, and addresses its concern not to Judge Batten, who has presided over the *Calhoun* case for the past seven years, or to Special Master Joe Whitley, who was appointed specifically to deal with concerns regarding the Calhoun Orders, but to the Chief Judge of this Court, without citing any reason or legal authority suggesting that Judge Batten and Special Master Whitley should be removed or disqualified for hearing and deciding their complaint.

[15]    First Supplemental and Amended Joint Preliminary Report and Discovery Plan in *Ruch v. Atlanta*, 1:15-CV-03296-MHC (Dkt. 59), p. 2.

Plaintiffs at all, and without filing any motions before any of the four judges

adjudicating the underlying cases approaching discovery.

### III.   DEFENDANTS HAVE NOT ALLEGED OR PROVEN ANY VIOLATION OF ANY ETHICAL RULE

Defendants have not cited the ethical rules that they assert have been

violated.  Instead, they cite one inapplicable case, discussed below.  The

Declarations of Professors Fox and Rudovsky address in detail the lack of any

ethical breach whatsoever by Plaintiffs' counsel, and the unethical conduct of the

Defendants' counsel in filing the Emergency Petition.  Indeed, Plaintiffs' counsel

were ethically required to perform their role as advocates for their clients, and

are by definition not neutral.

Defendants rely on *Young v. United States, ex. Rel, Vuitton ET Fils, S.A.*, 481

U.S. 787 (1987).  That case tested the ethical issues associated with the

appointment of a special prosecutor to criminally prosecute criminal defendants

for trademark infringement.  The portion of the opinion, relied upon by

Defendants, finds that the district court could not appoint as a Special Prosecutor

a private attorney who had a financial interest in the outcome(s) of his

prosecutorial role.

The Supreme Court first turned to the "distinctive role of a prosecutor,"

and their "unique responsibility" under the ethical rules.  The Court reviewed

the ABA Model Code of Profession Responsibility rules dealing with the special

responsibility of a "public prosecutor" which "differs from that of the usual advocate." The Court also reviewed the Code of Federal Regulations policies developed specially for Department of Justice Attorneys. *Id.* at 803-804. "Private attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated." *Id.* In contrast, the Court said, was a private attorney's duty to their private clients – "the highest claim of the most noble advocate …. fidelity, unquestioned, continuing fidelity to the client." *Id.* (quoting *Brotherhood of Locomotive Fireman & Engineermen v. United States*, 411 F.2d 312, 319 (5th Cir. 1969)).

In addition to the special Ethical Consideration and Department of Justice Regulations for Special Prosecutors, the Court noted criminal statutes that applied to Special Prosecutors who were not disinterested. The Court next reflected upon the unique powers of the prosecutor that raised the potential for conflicting obligations:

> A prosecutor exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court. *Id.* at 807.

Finally, the Court addressed the various private cases that might be impacted by the Special Prosecutor's responsibilities representing the United States in criminal actions.  *Id.*  at 806.  Given all those factors, the Court held that "counsel for a party that is the beneficiary of a court order may not be appointed as prosecutor in a contempt action alleging a violation of that order."  *Id.* at 809.

Each of the building blocks for *Young's* holding are absent here: no criminal prosecutor; no private attorney as Special Prosecutor; no appointment of a party's counsel to a government role; the prosecutor's lack of supervision by a court; and most importantly all the ethical standards discussed apply only to government prosecutors.  Grossman and Weber were <u>never</u> appointed to serve the role of court appointed monitors – they acted for their clients enforcing injunctive relief orders.  Contempt orders were entered by two independent Article III judges.  That contempt actions in *Calhoun* and *Anderson* had some incremental benefit to municipal liability in some other cases simply means that Counsel's actions even benefitted clients in other cases that had not yet even been filed.  *Rudovsky Decl.* ¶¶ 8-11.

Defendants' citation to *Young* illustrates again their fundamental misunderstanding of the plaintiffs' role in enforcing an injunctive relief order. Under *Young*, Plaintiffs should not (and did not) seek appointment to be a Special Master in their own case.  Grossman, Weber and Nevins acted solely as

zealous advocates for their clients in seeking and winning contempt orders that

helped ensure compliance, or as *Young* itself puts it, "the highest claim of the

most noble advocate …. fidelity, unquestioned, continuing fidelity to the client."

*Id.* at 804. *Fox Decl.* ¶¶ 6, 7, 10-12, 14-31; *Rudovsky Decl.* ¶ 8.

Defendants also claim that Plaintiffs' counsel were obligated to inform the

*Anderson* and *Calhoun* courts that granting contempt might incrementally help

some not-yet-filed other lawsuits on a particular municipal liability theory.  Def.

Brf. at 37-39.[16]  First, Plaintiffs did not file the contempt action for the purposes of

helping other yet-to-be filed cases, but rather because, as the *Anderson* and

*Calhoun* courts found, the Defendants were in fact in contempt.  Second, under

Defendants' theory, Plaintiff's counsel was ethically required to disclose in open

---

[16]    Defendants present the facts in manner suggestive of a "conspiracy theory," under which the filing of the contempt motions in *Calhoun* and *Anderson*, and the filing of complaints on behalf of Plaintiffs *Ruch*, *Croland*, and *Toole*, were somehow interrelated.  The reality is far less exotic.  As a result of the Atlanta police department's response to the "Ferguson protests" of November 2014, which was widely covered by the Atlanta news media, attorneys Weber and Grossman became aware that the City of Atlanta was likely in violation of court orders in two cases -- *Calhoun* and *Anderson* -- in which these attorneys had been counsel of record for years.  As counsel for the plaintiffs in those two cases, Weber and Grossman (along with attorney Greg Nevins in *Calhoun*) investigated and sought contempt to enforce the court orders and protect the interests of their clients in those two cases. Three persons arrested during those Ferguson protests -- Austin Gates, John Ruch, and Corey Toole – decided to file actions for damages for their unlawful arrests and chose to retain different teams of attorneys including Weber and Grossman, *because* they wanted counsel deeply familiar with the issues that led to their unlawful arrests.

court their mental impressions about a legal theory that they planned to use in other cases on behalf of future clients.  That would mean that in May 2015 plaintiffs' counsel must somehow anticipate and reveal their legal theories months (and in one case years) before they even filed those new cases in September 2015 and August 2016 and for two cases before either had even been retained.[17]  Third, the Georgia Rule of Professional Conduct 3.3 bars a "false statement of material fact or law" to a tribunal and there was no such false or material statement made, as the potential collateral benefits of contempt were not material to the contempt proceedings and no false statements were identified by Defendants or made by Plaintiffs' counsel.[18]  *Fox Decl.* ¶¶ 32-37 (finding Defendants' allegations of ethics violations "irresponsibl[e];" in violation of the Georgia Rules of Professional Conduct and Rule 11);  *Rudovsky Decl.* ¶ 11 ("I

---

[17]     In *Toole* and *Gates*, Counsel's Weber and Grossman had not even been retained at the time that they filed contempt motions in *Anderson* and *Calhoun.*

[18]     Without citing any rule, Defendants also claim "a deceptive omission of material fact that violates Georgia's ethical standards." Def. Brf. at 37.  However, Georgia Rule of Professional Conduct 3.3(a)(2), which addresses "failure to disclose a material fact," applies only "when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client."  Moreover, the disclosure suggested by Defendants would itself violate Georgia Rule of Professional Conduct 1.6 regarding confidentiality by revealing work product (in the form of trial strategy); *see also Comment 5* ("Rule 1.6 applies not merely to matters communicated in confidence by the client but also to all information gained in the professional relationship, whatever its source."). *Fox Decl.* ¶¶ 32-37.

know of no limitation on the right of the plaintiff's lawyers to use [monitoring] information in support of claims made in other litigation.").

Finally, Defendants complain of an "unwillingness to provide the *specific* information requested by the City to ensure" compliance.  Def. Brf. at 24-25.  The City never made an actual discovery request, ever, in the compliance stage, through which such issue could be vetted.  Indeed, had they done so, Plaintiffs' counsel would have explained that certain information was work product, other information would have exposed individual officers to retaliation, etc.   Where those concerns are not present, over the last six-plus years, Plaintiffs' counsel have provided volumes of information concerning non-compliance information to Defendants (and will provide the voluminous information that has been provided over that period to this Court upon request).

Plaintiffs' counsel violated no ethical rules, period, in successfully litigating two cases, holding the City in contempt on multiple occasions, and filing (and so-far successfully litigating) four more cases for clients who all simply want the Defendants to follow the Constitution.

IV. **NONE OF THE FEES AND EXPENSES AWARDED IN *CALHOUN* WERE CONTESTED BY DEFENDANTS PURSUANT TO THE *CALHOUN* PROCESS**

Defendants raise several frustrations about the fees awarded to plaintiffs' counsel for the work they have done in monitoring, and suggest that there is a

monetary goal in plaintiffs' compliance work.[19]  Def. Brf. 29-30.  Yet, the *Calhoun*

orders sets out a specific process for contesting fees and expenses, and the City

has never once contested fees using the court mandated procedure.  The *Calhoun*

order provides:

> The City of Atlanta shall reimburse Plaintiffs' counsel for any
> reasonable fees and costs they expend in ensuring compliance with
> the Orders of this Court, including but not limited to counsel's
> involvement in the tasks described above. The ·City of Atlanta shall
> pay these sums directly to Plaintiffs' counsel upon receipt of
> itemized accounting of reasonable time and expenses, or submit
> Plaintiffs' accounting to the Court for review if the City believes any
> accounting to be unreasonable. [*Calhoun* Doc. 289]

Defendants have never complied with this clear process for challenging any

fees.[20]

---

[19]    Counsel Weber notes one fact that the City omits – all of his fees and
expenses for compliance work in *Calhoun* have gone to the Southern Center for
Human Rights, where he makes a salary of under $40,000/year.

[20]    Defendants suggest that the Plaintiffs' conditioned a Special Master on
their ability to seek fees for their own monitoring duties for Plaintiffs.  Def. Brf. at
22-23.  Yet, the quote they identify simply raises the concern by Plaintiffs that the
taxpayers would have to pay both Plaintiffs' counsel and the Special Master.
Plaintiffs, fulfilling monitories duties where they are a prevailing party under
Section 1988 are entitled, as a matter of clear law, to fees and expenses for the
work they do ensuring that their clients receive the benefit of injunctive relief
orders.  *Adams v. Mathis,* 752 F.2d 533, 534 (11th Cir. 1985).  Ultimately, the City
agreed to the Special Master appointment order about which the City now
complains.

Defendants also assert that Plaintiffs "billed the City for monitoring activity which yields them information about specific employees who are non-compliant." Def. Brf at 8. The short answer is that Plaintiffs' enforcement of injunctive relief monitoring requires them to drill down into specifics, such as whether officers filled out required forms, followed training, were disciplined or not, etc. Defendants also claim that Plaintiffs sought fees in *Anderson* that were associated with the *Ruch* and *Croland* cases. Def. Brf. at 18. A review of the *Anderson* case file will reveal that both those incidents were used as examples of non-compliance and its consequences in the *Anderson* contempt action, and that no billing was done for the latter cases in the former.

Defendants' claims about billing are properly raised in the individual courts, but in any event, lack any factual basis.

## CONCLUSION

Plaintiffs submit that the Defendants' motion is frivolous, and should be denied expeditiously so that all cases can proceed in the normal course. They also request that any order of this Court be made a part of the filings in each of the respective courts.

While fees and expenses for the defense of this motion are already covered by the order in *Calhoun*, and in each of the other cases should plaintiffs later be prevailing parties, Plaintiffs have provided notice pursuant to Federal Rule of

Civil Procedure 11[21] and request that this Court both award fees and expenses in defense of this frivolous motion and impose additional monetary or other sanctions as permitted under Rule 11(c)(2).   The Emergency Petition is so blatantly a violation of Rule 11 that Professor Fox concludes "to a reasonable degree of certainty that this [filing] is one of the most serious breaches of the limits of proper advocacy I have ever encountered." *Fox Decl.* ¶ 7, 13, 25, 36-47.

DATED: This the 9th day of February, 2017.

/s/ Gerald Weber
Gerald R. Weber, Jr.
GA State Bar No. 744878
Southern Center for Human Rights
83 Poplar St. NW
Atlanta, GA 30303
Telephone: (404) 688-1202/(404) 522-0507
Facsimile: (404) 688-9440


*/s/ Daniel J. Grossman*
Daniel J. Grossman
GA State Bar No. 313815
1579 Monroe Dr., Suite F-138
Atlanta, GA 30324
Telephone: (404) 654-0326
Dan@DanGrossmanLaw.com

Attorneys for all Plaintiffs in Underlying Cases
(except Grossman on *Toole)*

---

[21]   Attached hereto as Exhibit E is Plaintiffs' Motion for Rule 11 Sanctions, served on Defendants' counsel on January 30, 2017.  This motion will be filed as a motion on February 20, 2017 pursuant to the terms of Rule 11.

/s/ G. Brian Spears
Georgia Bar No. 670122
Law Offices of G. Brian Spears, PC
1126 Ponce de Leon Avenue
Atlanta, Georgia 30306
(404) 872-7086

Attorney for Plaintiff-Croland

/s/ Hollie Manheimer
Hollie Manheimer
Georgia Bar No. 468880
150 East Ponce de Leon Ave
Suite 230
Decatur, Georgia 30030
(404) 377-0485

Attorney for Plaintiff-Ruch
/s/ Mawuli Davis
Georgia Bar No. 212029
The Davis Bozeman Law Firm
4153 Flat Shoals Parkway Suite 332
Decatur, GA 30034
(404) 244-2004

/s/ Nora Benavidez
Georgia Bar No. 698687
Counsel for Plaintiff
869 Briarcliff Road, #B-12
Atlanta, GA 30306
(310) 365-5658

Attorneys for Plaintiff-Toole

/s/ Greg Nevins
Gregory R. Nevins
GA State Bar No. 539529
Elizabeth L. Littrell

GA State Bar No. 454949
Lambda Legal Defense & Education
730 Peachtree St. NE, Suite 1070
Atlanta, GA 30308
Telephone: (404) 897-1880
Facsimile: (404) 897-1884

Attorneys for Plaintiffs-Calhoun, et. al.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing

**<u>RESPONSE TO PETITION FOR EMERGENCY RELIEF</u>** with the Clerk of Court

using the CM/ECF system which will automatically send electronic mail

notification of such filing to all counsel of record.

DATED: This the 9th day of February, 2017.

/s Gerald Weber

_____

Gerald Weber